**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LIVINGWELL MEDICAL CLINIC, INC.,
PREGNANCY CARE CENTER OF THE
NORTH COAST, INC., and CONFIDENCE
PREGNANCY CENTER, INC.,

        Plaintiffs,

  v.

KAMALA HARRIS, Attorney General of the
State of California; KAREN SMITH, M.D.,
Director of California Department of Public
Health; MICHAEL COLANTUONO, City
Attorney of Grass Valley, California; ALISON
BARRAT-GREEN, Country Counsel of Nevada
County, California; CINDY DAY-WILSON,
City Attorney of Eureka, California; JEFFREY
S. BLANCK, County Counsel of Humboldt
County, California; CHRISTOPHER A.
CALLIHAN, City Attorney of Salinas,
California; CHARLES J. MCKEE, County
Counsel of Monterey County, California;

        Defendants.

_____/

No. C 15-04939 JSW

**ORDER DENYING MOTION FOR
PRELIMINARY INJUNCTION AND
DENYING REQUEST FOR A STAY
PENDING APPEAL**

Now before the Court is the motion for a preliminary injunction filed by Plaintiffs

LivingWell Medical Clinic., Inc., Pregnancy Care Center of the North Coast, Inc., and Confidence

Pregnancy Center, Inc. (collectively "Plaintiffs").

Plaintiffs are non-profit faith-based pregnancy care centers that engage in medical and non-

medical activities to carry out their religious mission, including the administration of pregnancy tests

and ultrasounds, counseling and emotional support, and practical material assistance for new and

United States District Court
For the Northern District of California

1    expectant mothers.  The clinics' mission is "to help women with unplanned pregnancies meet and

2    accept the stresses and challenges that come with unplanned pregnancies," "to encourage through

3    education and outreach the recognition of human life from the moment of conception and to minister

4    in the name of Jesus Christ to women and men facing unplanned pregnancies by providing support

5    and medical services to them that will empower them to make healthy life choices," and "to help

6    women in a state of crisis as a result of an unplanned pregnancy by helping them understand and

7    work through the alternatives, enabling them to make an informed decision concerning the outcome

8    of their pregnancies."  (Complaint at ¶¶ 4, 9, 14.)

9        Plaintiffs seek to enjoin the enforcement of the California Reproductive FACT (Freedom,

10   Accountability, Comprehensive Care, and Transparency) Act (the "Act") which goes into effect on

11   January 1, 2016.  The Act mandates that "licensed covered facilities," such as Plaintiffs, disseminate

12   to clients on site a notice indicating that the State of California provides free or low-income access

13   to comprehensive family planning services, prenatal care, and abortion for all eligible women.

14   (Assembly Bill No. 775, Article 2.7, § 123471(a)(1).)  Covered facilities that fail to comply with the

15   requirements of the Act are liable for a civil penalty of five hundred dollars for the first offense and

16   one thousand dollars for each subsequent offense, if they do not correct the violation within 30 days

17   from the date of notice of noncompliance.  *Id.*  If a violation is verified, the Attorney General, city

18   attorney, or county counsel are permitted to bring a civil action for enforcement.  (*Id.* at §

19   123473(a).)

20        Plaintiffs contend that the dissemination of the mandated notice of State services is

21   inconsistent with their religious commitments as they believe that "abortion is wrong and have never

22   referred, nor would they refer, a client to have an abortion."  (Motion at 1; *see also* Declaration of

23   Cathy Seapy at ¶ 7; Declaration of Cindy Broese Van Groenou at ¶ 5; Declaration of Christine

24   Morris at ¶ 5.)  Plaintiffs' Complaint alleges that the Act violates their federal constitutional rights to

25   freedom of speech, freedom of assembly, and the free exercise of religion, in addition to violating

26   Article II, Sections 2 and 3 of the California Constitution.  However, Plaintiffs seek an injunction

27   based exclusively upon their First Amendment free speech right "in order to control their own

28

1  religious and pro-life messages, and without interference by state and local law enforcement

2  officials, while this case proceeds to a final adjudication on the merits."  (*Id.* at 1-2.)

3  **BACKGROUND**

4  **A.     The Reproductive FACT Act.**

5          On October 9, 2015, the governor of the State of California, Edmund G. Brown, Jr., signed

6  into law the Reproductive FACT Act, Article 2.7 of Chapter 2 of Part 2 of Division 106 of the

7  California Health and Safety Code.  The Act governs reproductive health services and applies to

8  clinics providing pregnancy-related services.  It becomes effective on January 1, 2016.

9          The Act provides that a "licensed covered facility" is defined as

10     a facility licensed under Section 1204 of an intermittent clinic operating under a
       primary care clinic pursuant to subdivision (h) of Section 1206, whose primary

11     purpose is providing family planning or pregnancy-related services, and that satisfies
       two or more of the following:

12     (1) The facility offers obstetric ultrasounds, obstetric sonograms, or prenatal care to
       pregnant women.

13     (2) The facility provides, or offers counseling about, contraception or contraceptive
       methods.

14     (3) The facility offers pregnancy testing or pregnancy diagnosis.

15     (4) The facility advertises or solicits patrons with offers to provide prenatal
       sonography, pregnancy tests, or pregnancy options counseling.
       (5) The facility offers abortion services.

16     (6) The facility has staff or volunteers who collect health information from clients.

17  (Assembly Bill No. 775, Article 2.7, § 123471(a).)  There is no dispute that Plaintiffs qualify as

18  licensed covered facilities under the Act.

19          The Act then provides that a licensed covered facility shall

20     disseminate to clients on site the following notice in English and in the primary
       threshold languages for Medi-Cal beneficiaries as determined by the State

21     Department of Health Care Services for the county in which the facility is located.

22     (1)  The notice shall state:

23     "California has public programs that provide immediate free or low-cost access to
       comprehensive family planning services (including all FDA-approved methods of

24     contraception), prenatal care, and abortion for eligible women.  To determine
       whether you qualify, contact the county social services office at [insert the telephone

25     number]."

26     (2) The information shall be disclosed in one of the following ways:

27     (A) A public notice posted in a conspicuous place where individuals wait that may
       easily be read by those seeking services from the facility.  The notice shall be at least

28     8.5 inches by 11 inches and written in no less than 22-point type.
       (B) A printed notice distributed to all clients in no less than 14-point type.

3

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> (C) A digital notice distributed to all clients that can be read at the time of check-in or arrival, in the same point type as other digital disclosures. A printed notice as described in subparagraph (B) shall be available for all clients who cannot or do not wish to receive the information in digital format.

(*Id.* at § 123472(a).)

The legislative history of the Act indicates that the California Legislature intended to ensure that women have access to the full spectrum of reproductive health care options and possess the information necessary to make informed reproductive health care decisions. (Declaration of Noreen P. Skelly ("Skelly Decl."), Ex. B at 8-9 (Assem. Comm. on Judiciary Analysis of Assembly Bill No. 775 (2015-2016 Reg. Sess.) April 28, 2015)) (evidencing legislative intent by indicating Act was passed "to ensure that California residents make their personal reproductive health care decisions knowing their rights and the health care services available to them."). The legislative history also indicates that

> there are nearly 200 licensed and unlicensed clinics known as crisis pregnancy centers (CPCs) in California whose goal is to interfere with women's ability to be fully informed and exercise their reproductive rights, and that CPCs pose as full-service women's health clinics, but aim to discourage and prevent women from seeking abortions. The author concludes that these intentionally deceptive advertising and counseling practices often confuse, misinform, and even intimidate women from making fully-informed, time-sensitive decisions about critical health care.

(*Id.*, Ex. A at 3 (Assem. Comm. on Health, Analysis of Assembly Bill No. 775 (2015-2016 Reg. Sess.) April 14, 2015).) The record indicates that the Legislature recognized that pregnancy decisions are time-sensitive and it is critical to provide full access to comprehensive medical care as early as possible in a pregnancy.

The law explicitly finds that every individual possesses a fundamental right of privacy with respect to reproductive decisions and that existing law provides that the State shall not deny or interfere with a woman's right to choose. The law further finds that all California women, regardless of income, should have access to reproductive health services, including family planning, contraception, health education and counseling, prenatal care, and abortion or delivery. (Assembly Bill No. 775, Article 2.7.)

Plaintiffs, faith-based pregnancy care centers, seek to enjoin the enactment of the statute on the basis that affirmatively speaking the government's mandated message is wholly contrary to

4

their faith-based mission and purpose.  Without waiving their other claims in the Complaint, Plaintiffs seek an injunction of the Act based only on their First Amendment free speech rights. Plaintiffs contend that the regulation governs content-based compelled speech, which is subject to strict scrutiny, and fails that standard of review.  Plaintiffs argue that Act serves no compelling interest and requiring distribution of the government's message is not the least restrictive means of advancing the Act's asserted interests.

Defendants, on the other hand, contend that although Plaintiffs are subject to the Act, their challenge is not yet ripe because the statute has not become effective and because Plaintiffs are not yet subject to its conditions.  Defendants also argue that Plaintiffs have not met their burden to demonstrate that they have a likelihood of success on the merits because the notice requirement of the Act falls into the realm of commercial speech, conduct, or professional speech, which deserves a lesser degree of scrutiny.  Additionally, Defendants argue that the balance of hardships and the public interest weigh against granting preliminary injunctive relief.

The Court will address additional specific facts as required in the analysis.

## ANALYSIS

**A.      Ripeness of Case and Standing to Challenge the Act.**

Before the Court may address the merits of Plaintiffs' claims under the First Amendment, it must address Defendants' challenge to the ripeness of the case and whether Plaintiffs have demonstrated standing to file suit.  Defendants request that this Court dismiss the action for lack of subject matter jurisdiction.

Federal courts' jurisdiction "is circumscribed by the 'case or controversy' requirement of Article III standing and by prudential considerations, such as ripeness." *Scott v. Pasadena Unified Schl. Dist.*, 306 F.3d 646, 654 (9th Cir. 2002).  "Article III of the Constitution requires that a plaintiff have standing before a case may be adjudicated." *Covington v. Jefferson Cnty.*, 358 F.3d 626, 637 (9th Cir. 2004).  To satisfy the Constitution's standing requirements, a plaintiff must show (1) an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be

**United States District Court**
For the Northern District of California

1   redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992);

2   *see also Covington*, 358 F.3d at 637-38. A plaintiff, as the party invoking federal jurisdiction,

3   bears the burden of establishing these elements. *Lujan*, 504 U.S. at 561. While the Supreme Court

4   has "always insisted on strict compliance with this jurisdictional standing requirement," the

5   standing inquiry must be "especially rigorous when reaching the merits of the dispute would force

6   [a court] to decide whether [a statute is] unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20

7   (1997).

8      The "ripeness doctrine is drawn both from Article III limitations on judicial power and

9   from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.,*

10   509 U.S. 43, 57 n.18 (1993). As a prudential matter, a claim is not ripe for judicial resolution "if it

11   rests upon contingent future events that may not occur as anticipated, or indeed may not occur at

12   all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotes and citation omitted). "The

13   basic rationale of the ripeness doctrine is to prevent courts, through avoidance of premature

14   adjudication, from entangling themselves in abstract disagreements." *Scott*, 306 F.3d at 662

15   (internal quotes and citation omitted). As with standing, "[t]he prudential considerations of

16   ripeness are amplified where constitutional issues are concerned." *Id.* To determine when a claim

17   is ripe, courts consider "both the fitness of the issues for judicial decision and the hardship to the

18   parties of withholding court consideration." *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136,

19   149 (1967)).

20      The constitutional component of the ripeness inquiry is often treated under the rubric of

21   standing and, in many cases, "ripeness coincides squarely with standing's injury in fact prong."

22   *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 1999). The overlap

23   between the doctrines of standing and ripeness in this context have led some commentators to

24   suggest that the doctrines "are often indistinguishable." *See id.* at 1138-39 (citing Erwin

25   Chemerinsky, *A Unified Approach to Justiciability,* 22 Conn. L. Rev. 677, 681 (1990)). Sorting

26   out the difference between the two "is not an easy task. Indeed, because the focus of our ripeness

27   inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline."

28   *Id.* (citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)).

United States District Court

For the Northern District of California

Whether this Court views the question as one of standing or of ripeness, under Article III, a federal court only has jurisdiction to hear claims that present an actual "case or controversy." *Allen v. Wright*, 468 U.S. 737, 750 (1984).  The issues presented must be "definite and concrete, not hypothetical or abstract." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945).  In order satisfy this prerequisite, a plaintiff must demonstrate that it has suffered an "injury-in-fact," *i.e.*, that he faces "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  The direct injury requirement, however, does not have to be fully consummated in order to obtain preventative relief.  *See, e.g., Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 143 (1974).  Rather, it is sufficient for standing purposes that "the plaintiff intends to engage in 'a course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000) (quoting *Babbitt,* 442 U.S. at 298).

The mere existence of a statute that potentially threatens a constitutional right is insufficient to create a case or controversy within the meaning of Article III.  *Thomas*, 220 F.3d at 1139 (citing *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983)).  A pre-enforcement challenge to the constitutionality of a statute is disfavored where the court can avoid the entanglement of abstract disagreements.  *See id.* at 1138.  "[N]either the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Id.* (citing *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996)).  Rather, in evaluating the genuineness of a claimed threat of prosecution, courts must address three independent factors: courts "look to whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.* (citing *Stoianoff*, 695 F.2d at 1126-27).

First, in order to adjudicate whether Plaintiffs have articulated a concrete plan to violate the law, the Court notes that although there is no dispute that Plaintiffs qualify as licensed covered

1  facilities and fall within mandate imposed by the statute, Plaintiffs have taken the position that

2  they will not abide by its proscription.[1]  Because Plaintiffs refuse to comply with the law, there is

3  sufficient indication of a concrete plan to violate the law. *Id.*  That fact is not dispositive however

4  as to whether Plaintiffs will suffer a resulting injury.  In *Wolfson v. Brammer*, the court recognized

5  that although Wolfson had never been threatened with enforcement proceedings, he had censored

6  his own speech to comply with the challenged code and had therefore had suffered a

7  "constitutionally recognized injury."  616 F.3d 1045, 1059 (9th Cir. 2010) (citing *Virginia v. Am.*

8  *Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (holding that self-censorship is "a harm that can be

9  realized even without an actual prosecution.")); *California Pro-Life Council v. Getman*, 328 F.3d

10  1088, 1094-95 (9th Cir. 2003); *see also Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) ("In

11  First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing

12  of 'self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free

13  expression.'"); *see also Mangual v. Rotger-Sabat*, 317 F.3d 45, 56 (1st Cir. 2003) (same).  Here,

14  Plaintiffs claim that they will not comply with the Act once it has become effective.  Therefore, it

15  does not appear that they will suffer the injury of self-censorship.

16       The second factor is whether the government has issued a specific warning or threat to

17  initiate proceedings.  A generalized threat of enforcement or prosecution under the statute is

18  insufficient.  *See Thomas*, 220 F.3d at 1139; *see also Libertarian Party of Los Angeles v. Nowen*,

19  No. 10-2488-PSG, 2011 WL 486553, at *3 (C.D. Cal. Feb. 3, 2011) (holding that plaintiffs cannot

20  establish standing where there are no facts alleged suggesting a credible threat of enforcement and

21  only "'general threats' by public officials to 'enforce those laws which they are charged to

22  administer'").  The Court notes that Defendant Kamala Harris does not intend to suspend

23

24       [1]   Defendants' challenges to the reliability of Plaintiffs' declarations, including representations
about their intention not to comply with the statute, are unpersuasive.  A declaration "need only
25  'substantially' comport with the model language set forth in 28 U.S.C. § 1746."  *United States v.*
*Backlund*, 588 Fed. Appx. 525, 527 (9th Cir. 2014) (citing *Commodity Futures Trading Comm'n v.*
26  *Topworth Int'l Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 2000)); *see also Cobell v. Norton*, 391 F.3d 251, 260
(D.C. Cir. 2004).  In addition, "[d]ue to the urgency of obtaining a preliminary injunction at a point
27  when there has been limited factual development, the rules of evidence to do not apply strictly to
preliminary injunction proceedings."  *Herb Reed Enterprises, LLC v. Florida Entertainment Mgm't,*
28  *Inc.,*736 F.3d 1239, 1250 n.5 (9th Cir. 2013).

1  enforcement of the Act once it becomes effective on January 1, 2016. (Docket No. 49 at 3.) On

2  the other hand, City and County Defendants represent that they do not intend to enforce the statute

3  during the pendency of this lawsuit, or until the Act is found constitutional. (Docket No. 51 at 2.)

4  This factor weighs in favor of a finding of standing as the primary governmental authority does not

5  deny that it intends to enforce the Act upon its enactment to clinics that violate its mandate.

6         Lastly, the Court addresses the third factor to determine whether there is a case or

7  controversy in challenging the enactment of a statute. Here, there is no history of enforcement

8  under the Act, as it has yet to become effective. Under the three factor test for determining

9  whether to there is a case or controversy necessary to establish standing for a pre-enforcement

10  challenge to the constitutionality of a statute, Plaintiffs fall short. *See id.* at 1139. The Court is

11  reluctant to address the Plaintiffs' objections to the impending statute in the absence of a "real

12  controversy, not hypothetical requests for an advisory opinion." *Thomas*, 220 F.3d at 1141.

13         However, a constitutional challenge premised upon the potential violation of the First

14  Amendment presents its own unique standing considerations. The Supreme Court, in an effort to

15  avoid a chilling effect of legislation that has the potential to restrict speech, has endorsed what

16  might be called a "hold your tongue and challenge now" approach rather than an approach of

17  requiring litigants to speak first and take their chances with the consequences. *See Dombrowski v.*

18  *Pfister*, 380 U.S. 479, 486 (1965) (finding pre-enforcement standing for First Amendment

19  challenge because of the "sensitive nature of constitutionally protected expression"); *see also*

20  *Bland v. Fessler*, 88 F.3d 729, 736-37 (9th Cir. 1996) ("That one should not have to risk

21  prosecution to challenge a statute is especially true in First Amendment cases . . . ."").

22  Accordingly, "when the threatened enforcement effort implicates First Amendment rights, the

23  inquiry tilts dramatically toward a finding of standing." *LSO*, 205 F.3d at 1155. The court in

24  *Thomas* "did not purport to overrule years of Ninth Circuit and Supreme Court precedent

25  recognizing the validity of pre-enforcement challenges to statutes infringing upon constitutional

26  rights." *Getman*, 328 F.3d at 1094 (citing *Thomas*, 220 F.3d at 1137 n.1 (noting that "our decision

27  neither shuts the door to pre-enforcement challenges to laws that allegedly infringe upon

28  constitutional rights, nor does it establish a new approach to justiciability")). "Courts have long

recognized that '[o]ne does not have to await the consummation of threatened injury to obtain preventative relief.'" *Id.* (citing *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)). "It is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *Id.* at 1095.

Plaintiffs' intention not to comply with the law here creates uncertainty as to whether they will actually sustain any injury of chilling of their speech. However, the Court is cognizant that, in the specific context of the First Amendment, the Hobson's choice between compliance with a statute and a challenge to its constitutionality awaiting enforcement proceedings should not preclude a finding of standing or ripeness to make a preliminary adjudication of the claims. *See, e.g., Getman*, 328 F.3d at 1095 (citing *Major v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)) ("A plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute.")

At this preliminary stage of the proceedings, based on the pleadings and on the limited facts before the Court, and upon an evaluation of the various factors relevant to a pre-enforcement challenge on First Amendment grounds, the Court finds that Plaintiffs have minimally established standing to pursue an injunction.

**B.     Legal Standards Applicable to a Motion for Preliminary Injunction.**

In order to obtain a preliminary injunction, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008) (citations omitted). The *Winter* court also noted that because injunctive relief is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). Thus, "[i]n each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* at 24 (citing *Amoco Production Co. v.*

1   *Gambell*, 480 U.S. 531, 542 (1987)).  In addition, where the government is a party, the public

2   interest and the balance of equities factors merge.  *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

3   1073, 1092 (9th Cir. 2014).  "In exercising their sound discretion, courts of equity should pay

4   particular regard for the public consequences in employing the extraordinary remedy of

5   injunction.'"  *Id.* (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

6       The Ninth Circuit has stated its "serious questions" sliding scale approach survives *Winter*,

7   whereby a court may grant preliminary injunctive relief if a plaintiff demonstrates "that serious

8   questions going to the merits were raised and the balance of the hardships tips sharply in the

9   plaintiff's favor."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)

10  (quoting *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled on other*

11  *grounds by Winter*, 555 U.S. at 22)).

12          [F]or the purposes of injunctive relief, "serious questions" refers to questions
            which cannot be resolved one way or the other at the hearing on the
13          injunction and as to which the court perceives a need to preserve the status
            quo lest one side prevent resolution of the questions or execution of any
14          judgment by altering the status quo.  Serious questions are "substantial,
            difficult and doubtful, as to make them a fair ground for litigation and thus
15          for more deliberative investigation."  *Hamilton Watch Co. v. Benrus Watch
            Co.*, 206 F.2d 738, 740 (2d Cir. 1952) (Frank, J.).  Serious questions need not
16          promise a certainty of success, nor even present a probability of success, but
            must involve a "fair chance of success on the merits."  *National Wildlife
17          Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir.1985) (Duniway, J.).

18  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).  Whether a plaintiff

19  establishes a likelihood of success on the merits or establishes serious questions going to the merits,

20  that plaintiff still must show the likelihood of irreparable harm and that the public interest favors an

21  injunction.  *Cottrell*, 632 F.3d at 1135.

22      The burden on a plaintiff challenging the operation of a statute is particularly heavy because

23  "it is clear that a state suffers irreparable injury whenever an enactment of its people or their

24  representatives is enjoined."  *Coalition for Econ. Equity v. Wilson*, 122 F.3d 781, 719 (9th Cir.

25  1997).  A more rigorous standard "reflects the idea that governmental policies implemented through

26  legislation or regulations developed through presumptively reasoned democratic processes are

27  entitled to a higher degree of deference and should not be enjoined lightly."  *Planned Parenthood*

28  *Minnesota v. Rounds,* 530 F.3d 724, 731 (8th Cir. 2008) (citing *Able v. United States*, 44 F.3d 128,

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

131 (2d Cir. 1995) (per curiam)).  A preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" and presents proof even more substantial than that required on a motion for summary judgment.  *See id.* at 736 (emphasis in original) (citing *Mazurek,* 520 U.S. at 972).

The Court finds that, as detailed in the analysis of the merits of their First Amendment claims, Plaintiffs have failed to meet the high standard required for granting of an injunction of the enactment of a legislative act.  Further, on the second factor required for grant of an injunction, Plaintiffs have failed to demonstrate that they would face irreparable injury if the Court permits the democratic process to develop.  Indeed, Plaintiffs maintain that their speech will not in fact be chilled.  The Court does not find that the balance of equities tips in Plaintiffs' favor, much less that it does so sharply.  Lastly, based on the legislative findings upon which the Act was premised, the Court finds that an injunction would not serve the public interest.

The Court addresses the likelihood of success on the merits in detail below.

## C.     First Amendment Claims.

The First Amendment not only protects against prohibitions of speech, but equally applies to protect against regulations that compel speech.  "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (citations and internal quotations omitted); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (holding that the "First Amendment . . . includes both the right to speak freely and the right to refrain from speaking at all.").  "There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796-97 (1988) (emphasis in original).  Compelled speech is particularly suspect as listeners "may have difficulty discerning that the message is the state's, not the speaker's, especially where the 'speaker

United States District Court

For the Northern District of California

1    [is] intimately connected with the communication advanced."   *Stuart v. Camnitz*, 774 F.3d 238,

2    246 (4th Cir. 2014) (citing *Hurley*, 515 U.S. at 576).

3         Here, the notice requirement of the Act is quintessentially compelled, content-based speech.

4    The Act would indisputably mandate that Plaintiffs provide information that they would otherwise

5    would not provide to their clientele.  Although there is no question that the required notices provide

6    information that is truthful and not misleading, an "'individual's right to tailor [his] speech' or not

7    to speak at all 'applies . . . equally to statements of fact the speaker would rather avoid." *Id.* (citing

8    *Hurley*, 515 U.S. at 573).  Accordingly, the Court finds that the compelled disclosures made

9    mandatory by the Act are content-based speech regulation.

10        In order to make the appropriate determination of the proper level of scrutiny to apply to the

11   proposed speech regulation, the Court must analyze the nature of the speech regulated by the Act.

12   The Court finds that the speech regulation is either commercial or professional speech, and

13   therefore entitled to a lower degree of scrutiny.

14        **1.    Commercial Speech.**

15        Although content-based speech regulations are ordinarily subject to strict scrutiny, lesser

16   degrees of scrutiny may apply where the speech at issue is either commercial or professional.

17   *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 189 (4th Cir. 2013).  Laws that compel or

18   regulate commercial speech are permissible if their "disclosure requirements are reasonably related

19   to the State's interest in preventing deception of consumers." *Milavetz, Gallop & Milavetz, P.A. v.*

20   *United States*, 559 U.S. 229, 250 (2010); *see also Zauderer v. Office of Disciplinary Counsel of*

21   *Supreme Court of Ohio*, 471 U.S. 626, 628 (1985) (emphasis in original; citations omitted)

22   ("Because the extension of First Amendment protection to commercial speech is justified

23   principally by the value to consumers of the information such speech provides, appellant's

24   constitutionally protected interest in *not* providing any particular factual information in his

25   advertising is minimal.").  Commercial speech may be broadly defined as "expression related to the

26   economic interests of the speaker and its audience, generally in the form of commercial

27   advertisement for the sale of good and services." *U.S. Healthcare, Inc. v. Blue Cross of Greater*

28   *Philadelphia*, 898 F.2d 914, 933 (3d Cir. 1990) (citing *Bolger v. Youngs Drug Products Corp.*, 463

United States District Court
For the Northern District of California

U.S. 60, 66-67 (1983)) (holding that the core notion of commercial speech is "speech which does no more than propose a commercial transaction.").

Within the class of regulations affecting commercial speech, "there are material differences between [purely factual and uncontroversial] disclosure requirements and outright prohibitions on speech." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001) (citing *Zauderer*, 471 U.S. at 650). "Regulations that compel 'purely factual and uncontroversial' commercial speech are subject to more lenient review than regulations that restrict accurate commercial speech and will be sustained if they are 'reasonably related to the State's interest in preventing deception of consumers.'" *Id.* (citing *Zauderer*, 471 U.S. at 651). Commercial speech that is not false or deceptive may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest. *Id.* (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980)). To satisfy this lower degree of scrutiny, the Court must determine whether the commercial speech regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest. *See Central Hudson*, 557 U.S. at 566.

The First Amendment protection afforded purely commercial speech "is based on the informational function of advertising." *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). There can by "no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Central Hudson*, 447 U.S. at 563. The required "disclosure of accurate, factual commercial information presents little risk that the state is forcing speakers to adopt disagreeable state-sanctioned positions, suppressing dissent, confounding the speaker's attempts to participate in self-governance, or interfering with an individual's rights to define and express his or her own personality." *Sorrell*, 272 F.3d at 114. The mandate that "commercial actors disclose commercial information ordinarily does not offend the important utilitarian and individual liberty interests that lie at the heart of the First Amendment. The level of scrutiny applied for commercial speech resembles rational basis review because the government is "free to prevent the dissemination of commercial speech that is false, deceptive, or misleading." *Zauderer*, 471 U.S. at 638. "The Amendment is satisfied, therefore, by a rational

connection between the purpose of a commercial disclosure requirement and the means employed to realize that purpose." *Sorrell*, 272 F.3d at 115 (citing *Zauderer*, 471 U.S. at 651); *see also Beeman v. Anthem Prescription Management, LLC*, 58 Cal. 4th 329, 356 (2013) (citations omitted) ("[L]aws requiring a commercial speaker to make purely factual disclosures relating to its business affairs, whether to prevent deception or simply to promote informational transparency, have a purpose consistent with the reasons for according constitutional protection to commercial speech.")

From the Supreme Court's decision in *Bolger*, courts have gleaned "three factors to consider in deciding whether speech is commercial: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *U.S. Healthcare*, 898 F.2d at 933 (citing *Bolger*, 463 U.S. at 66-67); *see also Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004).  While the combination of all these factors provides strong support for the conclusion that the speech is properly categorized as commercial, "it is not necessary that each of the characteristics 'be present in order for speech to be commercial.'" *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 285 (4th Cir. 2013) (citing *Bolger*, 463 U.S. at 67 n.14).

From a free speech perspective, context includes the viewpoint of the listener, for '[c]ommercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information.'" *Id.* at 286 (citing *Central Hudson*, 447 U.S. at 561-62); *see also Virginia State Bd. of Pharmacy. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (holding that the First Amendment protects speech both of the speaker and its recipient's right to receive information and ideas).  "Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Central Hudson*, 447 U.S. at 566.

In the context of the provision of medical care for pregnant women at faith-based critical care facilities, the Court finds that the mandated disclosures are commercial speech providing information to consumers of pregnancy-related medical services.  Plaintiffs disagree.  First, Plaintiffs contend that they are non-profit, religious-based clinics and that the compelled speech is

United States District Court
For the Northern District of California

not commercial as the clinics provide services free of charge.  The Court finds that the fact

Plaintiffs do not charge for their services not to be dispositive in the analysis of whether the

mandated speech should be considered fundamentally commercial in nature.  *See, e.g., First Resort,*

*Inc. v. Herrera*, 80 F. Supp. 3d 1043, 1052 (N.D. Cal. 2015) (holding that whether or not the clinic

charged for its services was not dispositive of its determination that the communication involved

was commercial speech); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520

U.S. 564, 573 (1997) (holding that a non-profit organization with religious mission engaged in

commercial speech); *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993) (addressing

the challenge of categorizing organization's mission based on value and the difficulty of "drawing

bright lines that will clearly cabin commercial speech in a distinct category").  "In any event, the

potential commercial nature of speech does not hinge solely on whether the [plaintiff] has an

economic motive, as [the cases do] not preclude classification of speech as commercial in the

absence of the speaker's economic motivation."  *Greater Baltimore*, 721 F.3d at 286 (citing *Bolger*,

463 U.S. at 67 n.14); *see also Fargo v. Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176, 180-

81 (4th Cir. 1986) (holding that the degree, if any, that monies are received by the nonprofit from

its clients is not dispositive of the determination of the commercial speech issue).

Although Plaintiffs are non-profit organizations, the Court finds that they provide valuable

pregnancy-related goods and services, such as pregnancy testing, ultrasound examinations,

maternity clothes, and baby supplies.  The speech relating to those goods and services can be

considered commercial in nature, and likely is considered commercial by many consumers of

Plaintiffs' services.  *See Greater Baltimore,* 721 F.3d at 286.  It thus may be deserving of some

lesser standard of review.  The attendant information provided by the clinics' staff in conjunction

with the provision of medical goods and services, even without exchange of money, may be

considered commercial speech.  The Court is wary to conclude definitively that the speech is

commercial on this limited record, but it is also concerned that dismissing the theory altogether

would constitute legal error.  *See Greater Baltimore*, 721 F.3d at 285 (holding that the district court

erred by abruptly concluding that the speech regulated under the ordinance at issue was not

United States District Court

For the Northern District of California

1  commercial speech and accepting as fact the plaintiff's assertion that its motives were entirely

2  religious or political).

3       Here, the Court finds that further discovery is needed both to substantiate Plaintiffs'

4  economic interests apart from their ideological motivations and to garner the perceptions of

5  Plaintiffs' clientele.  Although not specific to the Plaintiffs in this case, the legislative history is

6  replete with examples of deceptive speech by crisis pregnancy centers, "whose goal is to interfere

7  with women's ability to be fully informed and exercise their reproductive rights."  (*See e.g.*, Skelly

8  Decl., Ex. A at 3.)  The Court finds that, based on this limited record, Plaintiffs fail to make a

9  strong showing of likelihood of success on the merits on the issue that the mandatory notice does

10  not fall within the ambit of commercial speech.

11       Further, the Court finds that Plaintiffs have failed to make a showing of a substantial

12  question under this lower degree of scrutiny, whether the commercial speech regulation directly

13  advances a rational governmental interest asserted and whether it is not more extensive than

14  necessary to serve that interest.  *See Central Hudson*, 447 U.S. at 566.  Under the rational basis test,

15  the Court would find that the mandated disclosure "of accurate, factual, commercial information

16  does not offend the core First Amendment values of promoting efficient exchange of information or

17  protecting individual liberty interests.  Such disclosure furthers, rather than hinders, the First

18  Amendment goal of the discovery of truth and contributes to the efficiency of the 'marketplace of

19  ideas.'"  *Sorrell*, 272 F.3d at 113-14.  Because the mandated speech here provides only factual and

20  incontrovertibly true information about the range of pregnancy-related public health services

21  available and a phone number to obtain more information about those services, the Court finds that,

22  properly considered commercial speech, the mandated disclosures do not violate the principal

23  protections afforded Plaintiffs under the First Amendment.  The mandated disclosures mention an

24  array of services available to pregnant women in a collective list, including family planning,

25  contraception, prenatal care, and abortion.  (Assembly Bill No. 775, Article 2.7, § 123472(a).)  The

26  disclosures do not include language endorsing or recommending such services.  Rather, the

27

28

United States District Court

For the Northern District of California

mandated notice only notifies consumers of the existence of state-funded options.[2]  The Court finds

that, viewed as commercial speech, the regulation directly advances the rational government

interest of keeping pregnant women fully informed of their inherently time-sensitive options while

being provided pregnancy-related medical care.  *See, e.g., Madsen v. Women's Health Ctr., Inc.*,

512 U.S. 753, 767 (1994) ("[T]he State has a strong interest in protecting a woman's freedom to

seek lawful medical or counseling services in connection with her pregnancy.").

> ### 2.      Professional Speech.

Defendants also contend that the content-based speech regulation at issue here falls into the

realm of professional speech, deserving an intermediate degree of scrutiny.  Being a member of a

regulated profession does not result in the surrender of First Amendment rights.  *See Conant v.*

*Walters*, 309 F.3d 629, 637 (9th Cir. 2002).  However, Plaintiffs' status as licensed medical clinics

places the imprimatur of the State on the legitimacy of the clinics and their medical services

offerings.  *See, e.g., King v. Governor of the State of New Jersey*, 767 F.3d 216, 232 (3d Cir. 2014)

(holding that "[i]t is the State's imprimatur (and the regulatory oversight that accompanies it) that

provide clients with the confidence . . . to put their health or their livelihood in the hands of those

[professionals] who utilize knowledge and methods with which the clients ordinarily have little or

no familiarity.").

"Under our precedents it is clear the State has a significant role to play in regulating the

medical profession."  *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007); *see also Planned Parenthood*

*of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992) (emphasis added) ("To be sure,

the physician's First Amendment rights not to speak are implicated, but only as part of the practice

of medicine, *subject to reasonable licensing and regulation by the State*.").  Speech attendant to the

professional offering of valuable medical services falls somewhere at the "midpoint of the

continuum, within the confines of a professional relationship, [where] First Amendment protection

of a professional's speech is somewhat diminished."  *Pickup*, 740 F.3d at 1228.  "The state's

---

[2]     The Court does note that Plaintiffs are not in any way restrained from voicing any opinion regarding the services offered by the State, including a recommendation against abortion, or communicating any other opinion related to the notice.  *See   Pickup v. Brown*, 740 F.3d 1208, 1228-29 (9th Cir. 2013).

United States District Court
For the Northern District of California

1   obligation and power to protect its citizens by regulation of the professional conduct of its health

2   practitioners is well settled . . . .  [T]he First Amendment . . . does not insulate the verbal charlatan

3   from responsibility for his conduct; nor does it impede the State in the proper exercise of its

4   regulatory functions." *Id.* (citing *Shae v. Bd. of Med. Exam'rs*, 81 Cal. App. 3d 564, 577 (1978));

5   *see also Moore-King v. Cnty. of Chesterfield, Va.*, 708 F.3d 560, 569 (4th Cir. 2013) ("Under the

6   professional speech doctrine, the government can license and regulate those who would provide

7   services to their clients for compensation without running afoul of the First Amendment.").  "The

8   First Amendment tolerates a substantial amount of speech regulation within the professional-client

9   relationship that it would not tolerate outside of it.  And that toleration makes sense: When

10  professionals, by means of their state-issued licenses, form relationships with clients, the purpose of

11  those relationships is to advance the welfare of the clients, rather than to contribute to public

12  debate." *Pickup*, 740 F.3d at 1228.  The speech being regulated is professional speech where "the

13  speaker takes the affairs of a client personally in hand and purports to exercise judgment on behalf

14  of the client in the light of the client's individual needs and circumstances." *Moore-King*, 708 F.3d

15  at 569.

16          The medically licensed facilities at issue here are specifically regulated by California's

17  Health and Safety Code governing the public health.  In order to be licensed as a primary care

18  clinic, clinics must apply to the California Department of Public Health and must comply with a

19  series of licensing requirements to provide supervised medical care.  (*See* Skelly Decl., Ex. B at 9.)

20  A clinic must provide certain services, must have a licensed physician designated as the

21  professional director, and for any enumerated medical procedure, must provide a medical

22  professional to be present.  (*Id.* (citing 22 Cal. Code Regs. §§ 75026, 75027).)

23          This Court finds it persuasive that the regulation of professional conduct, especially in the

24  context of licensed medical facilities, is both legitimated and regulated by the state.[3]  Professional

25

26          [3]   The Court is not persuaded, however, by Defendants' contention that the mandated notice
    required by the Act should be viewed as purely conduct, rather than speech.  The Court finds the central
27  holding in *Pickup* distinguishable on the facts of that case.  740 F.3d at 1228-30 (holding that a "state
    enjoys considerable latitude to regulate the conduct of its licensed health care professional in
28  administering treatment.").  In that case, the Ninth Circuit rejected a First Amendment challenge to
    California's statute banning licensed mental health providers from administering Sexual Orientation

United States District Court

For the Northern District of California

1   speech regulations must withstand intermediate scrutiny, requiring that the law directly advance a

2   substantial government interest.  *See Ass'n of Nat'l Advertisers, Inc. v. Lundgren*, 44 F.3d 726, 729

3   (9th Cir. 1994).  Here, the legislative history of the Act indicates that one of the central purposes of

4   the proposed legislation was to provide the clinics' clients, who are pregnant, with notice of the full

5   spectrum of pregnancy-related medical services available to them.  (*See* Skelly Decl., Ex. B at 4.)

6   The history of the Act indicates that the California legislators were concerned that "women who are

7   pregnant are fully notified about the continuum of health care services available in the state.  With

8   respect to licensed health care facilities, the bill requires each client at the time of her visit to be

9   advised of the various publicly funded family planning and pregnancy-related resources available in

10  California, and how to directly access these resources."  (*Id.*)  In the recording of a client's medical

11  history and registering of women to receive pregnancy-related medical care, the clinics are

12  mandated to inform the patient of the state's alternative services in order best to inform women of

13  their available and time-sensitive medical options.  *See, e.g., Madsen*, 512 U.S. at 767; *see also*

14  *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975) ("States have a compelling interest in the

15  practice of professions within their boundaries, and that as part of their power to protect the public

16  health, safety, and other valid interests they have broad power to establish standards for licensing

17  practitioners and regulating the practice of professions.").

18          Given that Plaintiffs accept the responsibility of providing medically-supervised treatment

19  for patients, the Court finds that Plaintiffs have not raised a substantial question whether the

20  mandated notice would be construed as professional speech.  Again, the mandated speech provides

21  only factual and incontrovertibly true information about the range of pregnancy-related public

22  health services available, especially relevant to patients of clinics that only provide limited options

23  of health care alternatives.  The Court finds that, properly considered professional speech, the

24  mandated disclosures do not violate the principal protections afforded Plaintiffs under the First

25  Amendment.  The Court finds that, when viewed as professional speech, the regulation survives

26  _____

27  Change Effort therapy to child-patients.  The court held that merely because the therapy itself involved
    speech did not render the treatment insulated from regulation as fundamentally therapeutic conduct.  *Id.*

28  Here, the posting of information about services not provided by the clinics does not amount to treatment
    or qualify purely as conduct.

1    intermediate scrutiny as it directly advances a substantial governmental interest of keeping pregnant

2    women fully informed of the continuum of their options while being provided time-sensitive,

3    pregnancy-related medical care.

4    **D.    Remaining Preliminary Injunction Factors Weigh Against Grant.**

5         The Court finds that, as detailed in the analysis of the merits of their First Amendment

6    claims, Plaintiffs have failed to meet the high standard required for granting of an injunction.

7    Plaintiffs have not shown, based on the current record before the Court, that they are likely to

8    prevail on the merits of their First Amendment challenge and the balance of harm tips in their favor

9    or that there are serious questions going to the merits and that the balance of the hardships tips

10   sharply in their favor.  *See Winter* 555 U.S. at 20; *Cottrell*, 632 F.3d at 1135.  The mandated speech

11   may either qualify as commercial speech or professional speech and would pass the level of

12   scrutiny required for the enforcement of the Act.  Further, on the second factor required for grant of

13   an injunction, the Court finds that Plaintiffs have failed to demonstrate, without self-censorship,

14   that they would actually face irreparable injury if the Act were made effective.  Lastly, the Court

15   finds, based substantially on the merits of the claims at issue in this matter, that the balance of

16   equities does not tip in Plaintiffs' favor.  As found by the California legislative branch, the public

17   interest will be best served by application of the Act in full.  Maintaining the effectiveness of the

18   Act bestows upon the democratic process its due respect and affords due deference to the carefully

19   detailed legislative purpose of providing women full information regarding their time-sensitive

20   health care choices.  Accordingly, the Court denies Plaintiffs' request for an injunction.

21   **E.    Stay Pending Appeal.**

22        In the course of briefing the motion for a preliminary injunction, both parties represented

23   that should they not prevail at this stage, they would move for a stay of the Court's decision

24   pending appeal.  (Docket Nos. 49 at 8; 50 at 10.)  The Court considers the following four factors in

25   determining whether to issue a stay pending the appeal: "(1) whether the stay applicant has made a

26   strong showing that he is likely to succeed on the merits; (2) whether the applicant will be

27   irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other

28   parties interested in the proceeding; and (4) where the public interest lies." *Leiva-Perez v. Holder*,

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   640 F.3d 962, 964 (2011) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). These factors

2   should be examined on a flexible "continuum," which is "essentially the same as the 'sliding scale'

3   approach" applied to requests for preliminary injunctions. *Id*. at 964-66. Under this approach, "the

4   elements . . . are balanced, so that a stronger showing of one element may offset a weaker showing

5   of another." *Id*. at 964. Also, once "an applicant satisfies the first two factors, the traditional stay

6   inquiry calls for assessing the harm to the opposing party and weighing the public interest. These

7   factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

8           With respect to the first factor, Plaintiffs "must show, at a minimum, that [they have] a

9   substantial case for relief on the merits." *Id*. at 968. This requires Plaintiffs to show that success on

10  the merits is a "reasonable probability," or a "fair prospect," or that "serious legal questions are

11  raised." *Id*. at 967-68 (citations omitted). As is captured in the analysis of their request for an

12  injunction, the Court finds that Plaintiffs have not met this burden.

13          The Court further finds that Plaintiffs have not shown that they would be irreparably injured

14  if the Court does not issue a stay. To the extent Plaintiffs represent that they will not follow the

15  proscriptions mandated by the Act, their speech will not actually be chilled and they will have

16  adequate time to address fully the constitutionality of the statute on its merits in the course of this

17  litigation.

18          Finally, the Court finds that the public interest would be served by denying the stay pending

19  appeal and allowing the development of governmental policies generated through legislation or

20  regulations developed through presumptively reasoned democratic processes. *See, e.g., Planned*

21  *Parenthood Minnesota,* 530 F.3d at 731.

22          Therefore, the Court finds that a stay pending appeal is not warranted.

23                                          **CONCLUSION**

24          For the foregoing reasons, the Court DENIES Plaintiffs' motion for a preliminary injunction

25  and DENIES a stay pending appeal.

26          **IT IS SO ORDERED.**

27  Dated:   December 18, 2015                    _____

28                                               JEFFREY S. WHITE
                                                 UNITED STATES DISTRICT JUDGE